## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SERENA RICHTER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 15-775 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| PENNSYLVANIA STATE POLICE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM AND ORDER

Pending before the Court is a Motion for Summary Judgment (Doc. 69) filed by

Defendants Robert. F. Wilson ("Wilson"), Gino Fagnilli ("Fagnilli"), and John P. Weaver

("Weaver"), collectively, the Pennsylvania State Police ("PSP") Defendants. For the reasons

stated below, the PSP Defendants' Motion will be granted as to the false arrest claims against

Fagnilli and Wilson, and as to the malicious prosecution claim against Weaver, and denied as to

the remaining false arrest claim against Weaver.

### BACKGROUND[1]

The Court will recite only those facts that are material to resolving the PSP Defendants'

motion.[2] This civil rights lawsuit stems from a fatal car crash that occurred on June 16, 2011,

---

[1] The PSP Defendants have filed a "Statement of Material Facts Not in Dispute" (hereinafter "PSP Facts," Doc. 71), and Plaintiff has filed a "Concise Statement of Material Facts in Dispute" (hereinafter "Plaintiff's Facts" Doc. 83). The PSP Defendants have responded to Plaintiff's Facts (hereinafter "PSP Response to Plaintiff's Facts," Doc. 87), and Plaintiff has filed a "Supplemental Statement of Material Facts in Dispute in Response to PSP Defendants' Response" (hereinafter "Plaintiff's Supplement," Doc. 89).
[2] The Court addressed the Motion for Summary Judgment filed by Defendant Jack R. Heneks in a Memorandum and Order issued March 22, 2018 (Doc. 90).

and the ensuing investigation and criminal prosecution. (See Plaintiff's Supplement[3] at ¶¶ 2, 6, 24; PSP Facts at ¶¶ 1, 16.) Plaintiff Serena Richter ("Richter") states that she was a passenger in a vehicle driven by Samuel McKnight ("McKnight") "when the vehicle left the roadway, impacted a utility pole and/or a wooden fence post, and rolled over several times." (Amended Complaint at ¶ 10, Doc. 23). McKnight was ejected from the vehicle and died. (Plaintiff's Supplement at ¶ 6; PSP Facts at ¶ 16). Construing the disputed evidence in a light most favorable to Plaintiff, Richter and McKnight left a Sportsman's Club minutes before the accident, with McKnight driving the vehicle. (See Plaintiff's Supplement at ¶ 23.) Two years after the accident, on June 14, 2013, a criminal complaint was filed against Plaintiff charging her with Homicide by Vehicle While Driving Under the Influence, among other related charges. (Id. at ¶¶ 17, 24; PSP Facts at ¶¶ 63, 73.)

Three PSP officers investigated the incident: Wilson, Fagnilli and Weaver. Wilson was the first PSP official to arrive at the crash scene. (Plaintiff's Supplement at ¶ 6; PSP Facts at ¶ 18.) Upon arriving, Wilson saw Richter kneeling next to McKnight's body saying repeatedly "I told you not to drive." (Plaintiff's Supplement at ¶ 6; PSP Facts at ¶¶ 20-21.) Shortly after Wilson arrived, Fagnilli joined him at the scene and Wilson explained to Fagnilli what he knew at the time, including Richter's repeated statement as she knelt over McKnight's body: "I told you not to drive." (Plaintiff's Supplement at ¶ 6; PSP Facts at ¶¶ 37-39.) Fagnilli examined the

---

[3] Plaintiff's Facts (Doc. 83) do not comply with Local Rule 56(C)(1)(a), which requires Plaintiff to admit or deny each fact contained in the moving party's statement of facts. In addition, Plaintiff's Facts do not comply with the undersigned's Practices and Procedures, which require the responding party to "include a reprint of each original fact statement, followed by the response, seriatim." Practices and Procedures of Judge Cathy Bissoon, § II.D (available at www.pawd.uscourts.gov/sites/pawd/files/JudgeBissoon-Chamber-Rules-Revised-20170214.pdf). Plaintiff's Supplement (Doc. 89) does, however, admit, deny or supplement the numbered paragraphs in the PSP Facts (Doc. 71). And, the PSP Response to Plaintiff's Facts (Doc. 87) admits, denies or supplements each paragraph in Plaintiff's Facts.

vehicle and saw that the driver's seat was closer to the front than the passenger seat; he contacted

Weaver, a Collision Analysis and Reconstruction Specialist, to help investigate whether Richter

or McKnight was the driver of the vehicle. (Plaintiff's Supplement at ¶¶ 8-9; PSP Facts at ¶¶ 41-

44.) Meanwhile, Plaintiff was taken to a hospital, where her blood was drawn, and then

handcuffed and transported to a PSP station for questioning. (Plaintiff's Supplement at ¶ 6; PSP

Facts at ¶¶ 27-29.) During this process, Plaintiff informed the questioning officer that she had

been a passenger in the vehicle, in the midst of composing a text-message, when the accident

occurred. (Plaintiff's Supplement at ¶ 8; Exhibit 8 to PSP Appendix, Doc. 72-3.)

PSP officers interviewed individuals present at the scene of the accident. The parties

agree that none of the bystanders interviewed witnessed the crash, that Wilson informed Weaver

of Richter's repeated statement ("I told you not to drive"), and that Fagnilli's involvement after

that night was limited to testimony at Richter's criminal trial. (Plaintiff's Supplement at ¶ 11;

PSP Facts at ¶¶ 50-53.) The parties also agree that none of Wilson's written reports reflect

Richter's "I told you not to drive" statement, and that Wilson's reports[4] likewise omit the

statement of a bystander who told Wilson that he heard Richter say this. (Plaintiff's Supplement

at ¶ 11; PSP Facts at ¶¶ 50-53.)

The investigation continued thereafter, with Weaver filing applications for warrants to

search the vehicle (which were granted on June 17, 2011 and June 20, 2011),[5] and preparing a

---

[4] Plaintiff submits the following police reports signed by Wilson: An "Incident Report" in three parts, each dated June 16, 2011, and a "Continuation Sheet" dated February 20, 2014, describing the details of the incident. (Exhibit G to Plaintiff's Appendix, Doc. 86-6.) None of these reports mention Richter's statement "I told you not to drive."

[5] Plaintiff has included these search warrants and their accompanying affidavits as Exhibit DD to her Appendix (Doc. 86-32).

report stating his factual findings and conclusions as to the crash dynamics.[6]  (Plaintiff's Supplement at ¶ 12; PSP Facts at ¶¶ 54.)  Weaver concluded in the report that "[t]he dynamics of the crash make it unlikely that any occupant other than the right front seat passenger would have been ejected."  (Exhibit 1 to PSP Appendix, Doc. 72-1.)  In other words, Weaver's report concluded that it was unlikely that McKnight was the driver, as McKnight was the person ejected.

However, during the subsequent investigation, Weaver and Wilson became aware of three witnesses who indicated that they saw McKnight driving the vehicle on the night of the accident at the time that Richter and McKnight left the Sportsman's Club.  (See PSP Facts at ¶ 69-70; Plaintiff's Supplement at ¶ 23.)  Plaintiff obtained affidavits from these witnesses.  She provides evidence that her counsel discussed these with District Attorney Jack R. Heneks ("Heneks"), that her counsel submitted them to Heneks around August 28, 2012, and that Heneks forwarded them to the PSP for investigation.  (Exhibit AA to Plaintiff's Appendix, Doc. 86-29; Plaintiff's Supplement at ¶ 23.)  Yet, these witness affidavits, and the statements they contain, are not mentioned in Weaver's Affidavit of Probable Cause, dated June 14, 2013, attached to the Police Criminal Complaint.  (See Exhibit 6 to PSP Appendix, Doc. 72-3.)  Rather, with respect to the question of whether Plaintiff was the passenger or the driver, the Affidavit of Probable Cause states only that "the passenger, Samuel McKnight[,] was ejected and killed."  (Id.)

On June 14, 2013, after discussions with Heneks, Weaver drafted and filed a Police Criminal Complaint against Richter, accompanied by the abovementioned Affidavit of Probable Cause.  (Plaintiff's Supplement at ¶ 17; PSP Facts at ¶ 63.)  The parties agree that Heneks

---

[6] Weaver's report, dated August 17, 2011, is attached as Exhibit 1 to the PSP Appendix (Doc. 72-1).

ultimately directed Weaver to file the Criminal Complaint, but dispute whether the decision to file charges was made jointly by Weaver and Heneks. (Plaintiff's Supplement at ¶¶ 15-17; PSP Facts at ¶¶ 61-63.) The magisterial district judge attested to Weaver's Police Criminal Complaint, which contained an application for an arrest warrant or a summons; there is no direct evidence that the magisterial district judge issued an arrest warrant, but Pennsylvania Rule of Criminal Procedure 509(2)(a) would have required her to do so, and Plaintiff voluntarily surrendered at the magisterial district judge's office on June 27, 2013. (Plaintiff's Supplement at ¶ 26; PSP Facts at ¶ 76.) Plaintiff was released on an unsecured bond in the amount of $25,000. (Plaintiff's Supplement at ¶ 26; PSP Facts at ¶ 79.)

The criminal case proceeded to a jury trial in the Court of Common Pleas of Fayette County before the Honorable Nancy D. Vernon. On January 8, 2015, Judge Vernon granted Plaintiff's Motion for a Judgment of Acquittal and entered a Judgment of Acquittal on all counts. (Exhibit 7 to PSP Appendix, Doc. 72-3.)

Plaintiff initiated the instant action on June 12, 2015. (Doc. 1.) Following this Court's Memorandum Order on Defendants' Motions to Dismiss (Doc. 36), the claims remaining against the PSP Defendants are a false arrest claim against all of the PSP Defendants and a malicious prosecution claim against Weaver.

**ANALYSIS**[7]

The PSP Defendants move for summary judgment on several grounds: (1) to the extent that Plaintiff's claim for false arrest is based on the events of June 16, 2011, this claim is barred by the statute of limitations; (2) there is no evidence to show Wilson's or Fagnilli's personal involvement in the conduct allegedly violating Plaintiff's rights; (3) the PSP Defendants are entitled to derivative prosecutorial immunity or qualified immunity as to each of Plaintiff's claims; (4) there was probable cause for initiating the criminal proceedings against Plaintiff; (5) any deprivation of liberty that Plaintiff suffered was insufficient to trigger the Fourth Amendment's protections; and (6) there is no evidence to show that Weaver acted maliciously or with an improper purpose in filing charges against Plaintiff.

In this Court's Memorandum and Order on Defendant Heneks's Summary Judgment Motion (Doc. 90), the Court addressed two of the above arguments directly. Specifically, as to whether Plaintiff's deprivation of liberty was sufficient to trigger the protections of the Fourth Amendment, the Court found that "[t]he undisputed evidence in this case is sufficient to establish a constitutionally significant seizure." (Id. at 8.) The same analysis holds as to the PSP Defendants and the Court thus rejects the argument that Plaintiff failed to suffer a sufficient deprivation of liberty for the same reasons. As to whether there was probable cause for initiating

---

[7] Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law. See Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 172 (3d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In ruling on the pending motion for summary judgment, the Court must view the facts, and any reasonable inferences arising therefrom, in the light most favorable to the non-moving party. See Moody v. Atlantic City Bd. of Educ., 2017 WL 3881957, at *1 n.1 (3d Cir. Sept. 6, 2017) (citing Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005)).

criminal proceedings against Plaintiff, the Court found that the task of weighing the competing evidence was better suited to a jury. (Id. at 10-11.) For the reasons stated in this Court's prior Memorandum and Order (Doc. 90), the Court again finds that balancing the evidence known to the arresting officials at the time of arrest is a task for a jury. The Court will address the PSP Defendant's remaining arguments for summary judgment below.

## I. June 16, 2011 Arrest

Plaintiff states that she "did not, and does not, assert an independent claim based on her arrest on June 16, 2011. Clearly, this would be barred by the applicable statute of limitations." (Plaintiff's Brief in Opposition to PSP Defendants' Motion for Summary Judgment, hereinafter "Brief Against SJM," 2, Doc. 85.) Therefore, the Court clarifies for the record that Plaintiff does not assert such a claim.

## II. Personal Involvement of Fagnilli and Wilson

Liability for a false arrest claim requires the personal involvement of a defendant, which can be demonstrated through a defendant's affirmative contributions, personal direction, or actual knowledge and acquiescence. See Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)). Liability for a civil rights claim "cannot be predicated solely on the operation of respondeat superior." Id.

As clarified above, the relevant arrest for Plaintiff's claim is not the arrest on the night of the accident, but rather the arrest brought about by the institution of criminal proceedings against her, beginning in June 2013 and continuing through January 2015. Concerning Fagnilli and Wilson, Plaintiff's theory of liability is that there was no probable cause for her arrest in June 2013, and that Defendants contributed to her continuing false arrest by deciding to omit exculpatory evidence at several stages—specifically, omitting known exculpatory evidence from

the initial police reports, conversations with the district attorney, the affidavit of probable cause presented to the magisterial district judge, and their testimony at the preliminary hearing.  (See generally, Brief Against SJM.)

Defendants argue that Fagnilli and Wilson never met with Heneks to discuss filing charges and were not present when Plaintiff surrendered to the magisterial district judge; consequently, they had no participation in an arrest or seizure of Plaintiff under the Fourth Amendment.  (Brief in Support of PSP Defendants' Motion for Summary Judgment, hereinafter "PSP SJM Brief," 4, Doc. 70.)  However, this argument misapprehends the relevant theory of liability and the relevant deprivation of liberty under the Fourth Amendment.  Plaintiff's theory is that Defendants participated in her arrest by deliberately omitting exculpatory information from materials relied upon to arrest her.  The deprivation of liberty implicating the Fourth Amendment (that is, the relevant "arrest" or seizure of Plaintiff's person), includes the full series of criminal proceedings against Plaintiff.  Contrary to Defendants' argument, personal involvement in an arrest may exist where police officers omit exculpatory evidence from the materials used to bring about that arrest.  See, e.g., Andrews v. Scuilli, 853 F.3d 690, 697-98 (3d Cir. 2017); Reedy v. Evanson, 615 F.3d 197, 213 (3d Cir. 2010).

Thus, the question of Fagnilli's and Wilson's personal involvement boils down to whether they participated in, or knowingly acquiesced in, the omission of exculpatory evidence from the materials used to bring about her arrest.  Defendants argue that there is no record evidence of Fagnilli's or Wilson's personal involvement "in the initiation of criminal charges against Plaintiff or in any arrest or seizure pursuant to those charges."  (PSP SJM Brief 4.)  As to Fagnilli, Plaintiff "agrees that defendant Fagnelli [sic] had no further involvement after June 16, 2011," the night of the accident.  (Brief Against SJM 5, 5 n.1.)  Plaintiff presents no evidence

showing that Fagnilli participated in, or acquiesced in, the omission of exculpatory evidence from any materials used to effect Plaintiff's arrest. Accordingly, Defendants' Motion for Summary Judgment will be granted in part as to the false arrest claim against Fagnilli.

As to Wilson, Plaintiff provides evidence that Wilson was the officer in charge of Plaintiff's case, (Weaver Deposition, Exhibit D to Plaintiff's Appendix 24, Doc. 86-3); that he was aware of exculpatory statements made by Plaintiff and witnesses, (id. at 27; Wilson Deposition, Exhibit E to Plaintiff's Appendix 4, 21-22, Doc. 86-4); and that he failed to include this information in his signed police reports, (Exhibit E to Plaintiff's Appendix, Doc. 86-6). Plaintiff also states that Wilson failed to mention the exculpatory statements at the preliminary hearing in Richter's criminal case, (Plaintiff's Supplement at ¶ 26), although she provides no evidence to show that he was asked a question that provided an opportunity to mention exculpatory information.[8]

Concerning Wilson's pre-preliminary hearing actions, material omissions from police reports, like material omissions from warrant applications, may be grounds for a false arrest claim against an officer if the relevant document played a role in supporting the arrest. See Paoli v. Stetser, 2014 WL 3386037, at *30 (D. Del. Jul. 11, 2014) (Burke, M.J., Report and Recommendation) ("it is possible for a plaintiff to state a false arrest claim based on a false police report"), adopted in part and rejected in part on other grounds, 2014 WL 5847567 (D. Del. Nov. 10, 2014). Concerning Wilson's preliminary hearing testimony, material omissions from

---

[8] Plaintiff provides only one transcript page from Wilson's testimony at the preliminary hearing. (Exhibit T to Plaintiff's Appendix 2, Doc. 86-22.) The questions on this page, most of which concern the vehicle involved in the accident are: "You said you observed a white H3 vehicle?"; "Where did you observe that at the scene?"; "Do you recall which side it was on, if you recall?"; "And during the course of your investigation, did you have the opportunity to determine who the owner of the vehicle was?"; and "After you arrived on the scene and made your observations, what did you do then?" (Id.)

testimony at a preliminary hearing that have the effect of prolonging an arrest may be valid grounds for a false arrest claim. See Albright v. Oliver, 510 U.S. 266, 279 (1994) (Ginsburg, J., concurring) ("[i]f [a police officer] gave misleading testimony at the preliminary hearing, that testimony served to maintain and reinforce the unlawful hailing of [the plaintiff] into court, and so perpetuated the Fourth Amendment violation"). However, as mentioned above, Plaintiff has provided insufficient evidence to indicate omissions from Wilson's testimony.

Therefore, construing the disputed facts in a light most favorable to Plaintiff, there is sufficient evidence for a jury to conclude that Wilson was personally involved in Plaintiff's arrest by virtue of his omission of exculpatory statements from his police reports, but there is insufficient evidence as to omissions from Wilson's preliminary hearing testimony. Accordingly, in considering which of Wilson's actions may give rise to liability, if any, the Court will consider only Wilson's omissions from police reports.

### III.   Derivate Prosecutorial Immunity and Qualified Immunity

### A. Absolute Immunity

Defendants argue that they are entitled to derivative absolute immunity from liability because Weaver filed the criminal charges against Richter at Heneks's direction, and Heneks is entitled to absolute prosecutorial immunity for this conduct. (PSP SJM Brief 6.) However, the Court has already decided that Heneks is not entitled to absolute prosecutorial immunity for the false arrest claim against him. (Doc. 90.) Moreover, the PSP conduct that forms the basis for the false arrest claims is the omission of exculpatory evidence from police reports and the police criminal complaint, as discussed above. To the extent that the prosecutor played a role in these omissions, he would not be absolutely immune for this pre-charge conduct. See Yarris v. County of Delaware, 465 F.3d 129, 137 (3d Cir. 2006) ("where the role as advocate has not yet

begun . . ., absolute immunity does not apply"). Consequently, the Court finds that none of the PSP Defendants can benefit derivatively from prosecutorial immunity as to the false arrest claims.

As to the malicious prosecution claim against Weaver, a separate analysis applies, which focuses on Weaver's role during the prosecutorial phase of criminal proceedings. See, e.g., Davis v. Grusemeyer, 996 F.2d 617, 631 (3d Cir. 1993) (overruled on other grounds).[9] Weaver's prosecutorial-phase conduct includes his filing of the Police Criminal Complaint against Richter, which initiated criminal proceedings against her,[10] his testimony at her preliminary hearing, and his testimony at her trial. Whether Weaver is entitled to absolute prosecutorial immunity for the conduct supporting the malicious prosecution claim depends on whether Weaver was functioning as an extension of the District Attorney's Office; that is, whether his actions were subject to the District Attorney's direction. Id. Weaver is absolutely immune for prosecution-phase conduct he undertook at the District Attorney's behest. Id. ("because [he was] acting as the prosecutors' agent, [defendant police detective] enjoy[s] the same immunity from malicious prosecution claims").

Viewed in a light most favorable to Plaintiff, the evidence shows that Weaver drafted and filed the Police Criminal Complaint against Richter after he made a recommendation to Heneks that Heneks approve filing charges. (Exhibit D to Plaintiff's Appendix 23). Yet, the undisputed evidence also shows that Heneks specifically instructed Weaver to file the criminal complaint, and that Weaver followed this direction. (Id.; Exhibit Q to Plaintiff's Appendix 12, 13.) As a

---

[9] In Davis, the malicious prosecution claims related solely to police conduct after the prosecution had ensued, as the false arrest claims had been dismissed. Davis, 996 F.2d at 631 n.29.
[10] Generally, Pennsylvania criminal proceedings are instituted by filing a written complaint or by an arrest upon probable cause. Pa. R. Crim. P. 502.

result, Weaver is absolutely immune from liability for the core element of the malicious prosecution claim—the initiation of criminal proceedings against Plaintiff. Because Weaver is absolutely immune from liability for this claim, the PSP Defendants' Motion for Summary Judgment will be granted as to the malicious prosecution claim against Weaver.[11]

## B. Qualified Immunity

The PSP Defendants argue that they are entitled to qualified immunity for the remaining false arrest claims against Weaver and Wilson. (PSP SJM Brief 5.) "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). In order to be clearly established, the legal principal must be supported by then-existing

---

[11] The Court writes here to address an apparent inconsistency in finding that Weaver is entitled to immunity for obeying Heneks's direction to file the complaint, but that Heneks himself is not immune for directing Weaver to file the complaint, which also contained the application for the arrest warrant. (See Doc. 90.) There are two reasons that the Court's findings are mutually consistent. First, the filing of formal charges is a threshold event that separates the investigatory phase from the prosecutorial phase of a criminal proceeding. Spiker v. Allegheny Cnty. Bd. of Probation & Parole, 920 F. Supp. 2d 580, 600-601 (W.D. Pa. 2013) (no absolute immunity for directing an officer to obtain an arrest warrant before charges are filed). Weaver's filing of charges stands directly on that threshold, but Heneks's instruction to arrest occurred prior to the filing, during the investigatory phase. Second, the Court's rulings on immunity create parity in Heneks's and Weaver's exposure to liability for the same claims and the same conduct. To elaborate on both points, Heneks's direction to Weaver to file an application for an arrest warrant, even though that application was attached to a criminal complaint, was sufficient to show that Heneks played an affirmative role in Plaintiff's arrest during the pre-prosecutorial phase. It would be incongruous to find that the PSP Defendants—but not Heneks—could be liable for false arrest given Heneks's pre-prosecutorial role in directing the arrest. For the malicious prosecution claims, the analysis differs. Weaver's filing of charges began the prosecutorial phase of proceedings, and the filing of charges is conduct for which Heneks would have been absolutely immune had he been the filer. See Kulwicki v. Dawson, 969 F.2d 1454, 1463-64 (3d Cir. 1992) (prosecutor is absolutely immune for initiating charges). In terms of functional parity, the extension of Heneks's absolute prosecutorial immunity for malicious prosecution to Weaver creates parity between Heneks and Weaver on this claim: neither can be liable for malicious prosecution.

precedent to the point that it is "settled law."  Id. (quoting Hunter v. Bryant, 502 U.S. 224, 228

(1991)).  Further, the legal principle must, with a high degree of specificity, "clearly prohibit the

officer's conduct in the particular circumstances before him."  Id. at 590.

The PSP Defendants argue that, because Weaver consulted with District Attorney Heneks

on filing charges and because Heneks independently found that there was probable cause to file

charges, it is unreasonable to imagine that Weaver or the other PSP Defendants could have

known that they were violating the law.  (PSP SJM Brief 9.)  They argue that qualified immunity

protects police officers if they are "reasonably mistaken about the state of the law."  Ray v.

Township of Warren, 626 F.3d 170, 177 (3d Cir. 2010) (quoting Curley v. Klem, 499 F. 3d 199,

214 (3d Cir. 2007)).  Plaintiff argues, to the contrary, that it is clearly established that, if

"Defendants possessed and ignored plainly exculpatory evidence when submitting [the] warrant

application, this would undermine if not eviscerate a finding of probable cause."  Goodwin v.

Conway, 836 F. 3d 321, 329 (3d Cir. 2016).  As a result, she argues that the PSP Defendants are

not protected by qualified immunity.

Because it will clarify the Court's analysis, the Court will apply the two-step procedure

for assessing qualified immunity described in Saucier v. Katz, 533 U.S. 194 (2001).  See Pearson

v. Callahan, 555 U.S. 223, 242 (2009) (receding from Saucier and holding that judges have

discretion as to its application).

The first question in this analysis is: "[t]aken in the light most favorable to the party

asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional

right?"  Saucier, 533 U.S. at 201.

Under the Fourth Amendment to the United States Constitution, people have the right "to

be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures, . . . and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The Fourth Amendment thus "prohibits a police officer from arresting a citizen except on probable cause." Reedy v. Evanson, 615 F. 3d 197, 211 (3d Cir. 2010) (quoting Orsatti v. N.J. State Police, 71 F.3d 480, 482 (3d Cir. 1995). Probable cause for an arrest is determined based on the totality of events leading up to the arrest viewed from the standpoint of an objectively reasonable police officer. Wesby, 138 S. Ct. at 586. While there is no formal test, a court assessing probable cause considers the low-bar standard of whether there is a probability or substantial chance of criminal activity on the part of the criminal defendant. See id.

Construing the evidence favorably to Plaintiff, Wilson and Weaver made a swift determination, on the night of the accident, that Richter was the driver of the vehicle and was responsible for McKnight's death.[12] During the investigation, they became aware of various forms of exculpatory evidence: Richter's statement "I told you not to drive" as she kneeled over McKnight's body; Richter's explanation that McKnight was driving the vehicle and that she was composing text messages as a passenger, a claim that they failed to pursue in their investigation; affidavits from three witnesses who saw McKnight driving the vehicle minutes before the accident; and physical evidence that would cut against the conclusion that Richter was the driver of the car.[13] Because they had already formed a fixed belief about Plaintiff's guilt, they chose to exclude the exculpatory evidence from the police reports, the Police Criminal Complaint and the

---

[12] The following discussion construes the record evidence in a light most favorable to Plaintiff for purposes of resolving the PSP Defendants' Summary Judgment Motion.

[13] For example, Richter points to evidence from photographs taken by the PSP on the night of the accident showing "that a woman's sandal was wedged between the passenger seat and the passenger door and that a woman's purse was found in a well on the passenger side door." (Plaintiff's Supplement at ¶ 8.)

Affidavit of Probable Cause. Weaver also included an affirmative statement[14] in his Affidavit of

Probable Cause that he knew was misleadingly incomplete (at best): that "the passenger, Samuel

McKnight was ejected." The Affidavit provided no qualification as to the level of confidence in

that statement, nor did it refer to any evidence that would tend to support or contradict that

statement.[15] (See Brief Against SJM 10.)

Weaver's report on crash dynamics was the only evidence in the case against Richter that

would tend to show that she was the driver. Weaver's report concluded that it was unlikely that

McKnight, as the person ejected from the vehicle, was the driver (or, equivalently, that Richter

was probably the driver). This report's assessment of probability, however, did not account for

the exculpatory evidence mentioned above and Plaintiff disputes the methods used in the report.

(Plaintiff's Supplement at ¶ 13.)

_____

[14] Richter argues that the Affidavit of Probable Cause contains a second misstatement: that the vehicle came to rest "onto its left side" (the driver's side) when, in fact, the vehicle came to rest on its right side (the passenger's side). (Brief Against SJM 10.) The PSP Defendants admit this error. (PSP Facts at ¶ 66.) In light of the Affidavit's lack of contextual information concerning how the vehicle's resting position relates to the probability that Richter was the driver, this misstatement has no direct relevance to probable cause. However, as Plaintiff argues, it may evidence a "lack of effort and attention" bearing on the weight that a jury might afford to the inculpatory evidence. (Brief Against SJM 10.) This error also appears on the face of Weaver's report on crash dynamics. (See Exhibit CC to Plaintiff's Appendix, Doc. 86-31; Exhibit 1 to PSP Appendix, Doc. 72-1 (with correction noted)).

[15] The brief Affidavit of Probable Cause states, in full:

> This crash occurred as Unit 1 a white Hummer bearing PA registration HMB 2857 was traveling north on SR1051/Bute Rd. This vehicle traveled off of the right side of the roadway approximately 60 feet and then struck a utility pole with its right front. Following this impact the Hummer began to rotate clockwise and continued to travel in a northern trajectory. The left front of the [H]ummer then struck a large wooden fence post. This impact triggered a roll over event with the left side of the Hummer rolling to the ground for its point of first contact. The [H]ummer then rolled onto its roof. While on its roof, the passenger, Samuel McKnight was ejected and killed. The Hummer then rolled onto its right side, then back to all four wheels. It slid down and [sic] embankment and subsequently rolled back onto its left side[.] Both occupants were unrestrained in the vehicle.

(Exhibit EE to Plaintiff's Appendix 7, Doc. 86-33.)

As the Court found with respect to Heneks, the task of weighing the competing evidence on probable cause, which in this case boils down to the evidence that Richter was or was not the driver, is best left for a jury. (Doc. 90.) The Plaintiff-favorable view of the evidence, described above, is sufficient for a jury to conclude that probable cause for Plaintiff's arrest was lacking and that an objectively reasonably police officer would have been compelled to conclude as much under the totality of the circumstances known to the officer at the time. As a result, taken in a light most favorable to Plaintiff, the evidence shows that her right to be free from unreasonable seizures under the Fourth Amendment was violated.

Under the second step of the <u>Saucier</u> qualified immunity analysis, the Court asks "whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." <u>Saucier</u>, 533 U.S. at 201. In this analysis, "the focus is on whether the officer had fair notice that [his or] her conduct was unlawful," in recognition of the fact "that police officers are often forced to make split-second judgments." <u>Kisela v. Hughes</u>, 138 S. Ct. 1148, 1152 (2018). While the Court need not locate "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." <u>Id.</u> (quoting <u>White v. Pauly</u>, 137 S. Ct. 548, 551 (2017)). <u>But see</u> <u>White</u>, 137 S. Ct. at 552 ("clearly established law should not be defined at a high level of generality. . . . clearly established law must be particularized to the facts of the case." (internal quotation marks and citations omitted)).

Defining the scope of the right in a manner narrowly tied to the circumstances of this case, as this Court must, the specific constitutional right at issue is the right to be free from an arrest based on an officer's deliberate or reckless omission of facts to a judge assessing probable cause, when those facts would be sufficient to vitiate probable cause. <u>Cf.</u> <u>Taylor v. Barkes</u>, 135

S. Ct. 2042, 2044 (2015) (treating "an incarcerated person's right to the proper implementation of adequate suicide prevention protocols" as a right stated at the correct level of specificity).

The Court must examine whether precedent existing at the time of the arrest established this right. Wesby, 138 S. Ct. at 589. However, Supreme Court case law fails to resolve whether clearly established law may be determined through a circuit's precedents, a consensus of circuits or only through Supreme Court decisions. See id. at 591 n.8 ("We have not yet decided what precedents—other than our own—qualify as controlling authority for purposes of qualified immunity."); Taylor, 135 S. Ct. at 2044-45 (finding that the Supreme Court's decisions, a consensus of appellate cases, and the Third Circuit's decisions did not establish the right at issue—without deciding which of these tests was necessary.)

Accordingly, the Court will first examine the relevant Supreme Court precedents, then look to the consensus of circuits, and finally to precedents within the Third Circuit to determine whether the right defined above was clearly established at the time of Richter's arrest. The Court will then make this determination as to Weaver's and Wilson's conduct separately.

Longstanding Supreme Court cases clearly establish that arrests without probable cause are unconstitutional, Papachristou v. City of Jacksonville, 405 U.S. 156, 169 (1972), and that the government has a duty to disclose known exculpatory information to a defendant in the context of a criminal prosecution, Brady v. Maryland, 373 U.S. 83, 87 (1963). However, the duty to disclose exculpatory information to a defendant does not apply to this case, as Richter was aware of the exculpatory information known by the arresting officers. The crux of the issue is, instead, whether arresting officers may omit known exculpatory information from statements to a judge considering probable cause.

The Supreme Court has determined that "the Fourth Amendment's protection against unfounded invasions of liberty and privacy . . . require[s] that the existence of probable cause be decided by a neutral and detached magistrate whenever possible," including "a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." Gerstein v. Pugh, 420 U.S. 103, 112, 114 (1975). Further, "in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate?" Terry v. Ohio, 392 U.S. 1, 21-22 (1968) (internal quotation marks omitted). In other words, the Fourth Amendment right to be free from an arrest without probable cause includes the right to a judicial determination of probable cause. This determination must be based on all the material facts that would be known to a reasonable arresting officer, not only those that would support the arrest. Beck v. Ohio, 379 U.S. 89, 96 (1964) ("If the court is not informed of the facts upon which the arresting officers acted, it cannot properly discharge that function."). As a result, an official's statements to a court concerning probable cause must disclose known material facts that would weigh against an arrest. Id. at 97 (the prosecution had a duty to be more specific as to the facts leading to the arrest, otherwise, if the officers' "good faith alone were the test, the protections of the Fourth Amendment would evaporate"); Franks v. Delaware, 438 U.S. 154, 165 (1978) ("It is established law . . . that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter."); cf. Albrecht v. United States, 273 U.S. 1, 5 (1927) (a prosecutor's unverified affidavit supporting an arrest warrant renders the arrest unconstitutional under the Fourth Amendment).

Following this line of cases, the Supreme Court has addressed the specific circumstance of an officer's qualified immunity for deliberately or recklessly causing an arrest by presenting a judge with a criminal complaint and supporting affidavit that fail to establish probable cause. In Malley v. Briggs, 475 U.S. 335 (1986), the Court held that: "[T]he same standard of objective reasonableness that we applied in the context of a suppression hearing in [United States v. Leon, 468 U.S. 897 (1984)] defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest. Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." Malley, 475 U.S. at 344-45 (internal citation omitted). Certainly, deliberate or reckless omissions from an affidavit of probable cause, or other court filings that cause an arrest, rise to the level of rendering an official's belief in probable cause unreasonable if those omissions are sufficient to vitiate probable cause. Yet, there is no Supreme Court case that addresses precisely this point.

Despite the lack of a case directly on this point, the Court finds that Supreme Court precedent places the relevant constitutional question beyond debate. Based on the precedents just discussed, the officers were on notice that the Constitution does not permit them to deliberately or recklessly omit material facts from the consideration of a judge assessing probable cause.

To the extent that any officers had doubts about the materiality of the exculpatory evidence or the relevant law governing omissions, they had over a year to consider the evidence and conduct legal inquiries. One of the considerations animating the Supreme Court's recent qualified immunity cases, which hold that clearly established law must be particularized to the facts of a case, is the reality that officers must make split-second determinations in the interests

of safety.  See, e.g., Kisela, 138 S. Ct. at 1152; White, 137 S. Ct. at 551-52 (addressing officer's "quick choice to use deadly force").  Beyond the clarity of Supreme Court precedents bearing on Plaintiff's rights, the Court notes that the application of qualified immunity to the officers in this case, who had ample time to make their determinations, would be untethered to this rationale for providing qualified immunity protection.

Turning to a "robust consensus" of federal circuits, Taylor, 135 S. Ct. at 2044, there was near unanimity among the circuits in support of the right that Richter asserts at the time of her arrest.  Burke v. Town of Walpole, 405 F.3d 66, 70 (1st Cir. 2005) (officer's qualified immunity assertion fails where there is sufficient evidence that he intentionally or recklessly withheld exculpatory evidence from the magistrate who issued the arrest warrant); Golino v. New Haven, 950 F.2d 864, 871 (2d Cir. 1991) (same); Reedy v. Evanson, 615 F.3d 197 (3d Cir. 2010) (see discussion below); Miller v. Prince George's County, 475 F.3d 621, 631-32 (4th Cir. 2007) ("the Supreme Court has long held that a police officer violates the Fourth Amendment if, in order to obtain a warrant, he deliberately or with reckless disregard for the truth makes material false statements or omits material facts" (internal quotation marks omitted)); Sykes v. Anderson, 625 F.3d 294, 305 (6th Cir. 2010) (to prevail on a false arrest claim based on falsehoods or omissions, plaintiff must prove that officer's statements or omissions were material to probable cause and made deliberately or recklessly); Pitt v. District of Columbia, 491 F.3d 494, 511 (D.C. Cir. 2007) ("Based on the officers' affidavit—which contained several misstatements and omissions—[plaintiff] was detained . . . .  Accordingly, we hold that the evidence received at trial sufficiently demonstrates that the defendant officers violated [plaintiff's] Fourth Amendment rights."); see Hart v. O'Brien, 127 F.3d 424, 448-49 (5th Cir. 1997) ("A governmental official violates the Fourth Amendment when he deliberately or recklessly

provides false, material information for use in an affidavit in support of a search warrant, regardless of whether he signs the affidavit."); Olson v. Tyler, 771 F.2d 277, 282 (7th Cir. 1985) ("where the judicial finding of probable cause is based solely on information the officer knew to be false or would have known to be false had he not recklessly disregarded the truth, not only does the arrest violate the fourth amendment, but the officer will not be entitled to good faith immunity"); Livers v. Schenck, 700 F.3d 340, 357 (8th Cir. 2012) ("It was clearly established by 2006 that a seizure without a 'truthful factual showing sufficient to constitute probable cause' violates the Fourth Amendment."); KRL v. Moore, 384 F.3d 1105, 1117 (9th Cir. 2004) ("It is clearly established that judicial deception may not be employed to obtain a search warrant."); DeLoach v. Bevers, 922 F.2d 618, 621-22 (10th Cir. 1990) (same); Holmes v. Kucynda, 321 F.3d 1069, 1084 (11th Cir. 2003) (same).  But see Evans v. Chalmers, 703 F.3d 636 (4th Cir. 2012) ("a prosecutor's independent decision to seek an indictment breaks the causal chain unless the officer has misled or unduly pressured the prosecutor").

Finally, and particularly relevant to the officers' degree of notice, the Court of Appeals for the Third Circuit has clearly answered the question of when an officer's conduct in omitting facts from judicial consideration, thereby leading to an arrest, violates a person's Fourth Amendment rights.  In Reedy v. Evanson, 615 F.3d 197 (3d Cir. 2010), the court held that a police officer may violate a person's Fourth Amendment rights when he causes her arrest by filing an affidavit that "disregard[s] plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists."  Id. at 214 (quoting Wilson v. Russo, 212 F.3d 781, 790 (2000)).[16]  The test is whether the plaintiff can show: "(1) that the

---

[16] Applying longstanding Fourth Amendment jurisprudence, the Wilson court reasoned:
> All storytelling involves an element of selectivity.  We cannot demand that police officers relate the entire history of events leading up to a warrant application with every

police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." Id. at 213 (quoting Wilson, 212 F.3d at 786-87).

Similar to the specific circumstances in Reedy, the officers investigating Plaintiff became aware of strong exculpatory evidence during the investigation, had many months to consider the evidence, and ultimately filed police reports and charges that omitted any mention of the exculpatory evidence.[17] Plaintiff provides sufficient evidence to show that the officers "had obvious reasons to doubt the accuracy of the information [they] reported" in their filings. Id. These filings create the false impression—especially given the affirmative statement in the Affidavit of Probable Cause that McKnight was "the passenger"—that Richter was undoubtedly the driver. A finding that Richter was the driver, to a degree of probability, was necessary for a finding of probable cause. Absent the indication that McKnight was the passenger, there would

_____

potentially evocative detail that would interest a novelist or gossip ("... the witness blushed when I mentioned the gun, and blinked six times while studying the photographic array. I noticed his hand crept up to his lips (which were chapped) ..."). On the other hand, one of the reasons for requiring a neutral magistrate to evaluate probable cause is that an uninterested party is presumably better suited to review and evaluate the facts than an officer pursuing a lead. "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." Wilson, 212 F.3d at 787 (internal citations omitted).

[17] The only police report in the record that mentions, or suggests, Richter's account that McKnight was the driver is a Supplemental Investigation Report dated June 16, 2011, and signed by PSP Trooper John Krause, which contains Krause's account of his interview with Richter on the night of the accident. (Exhibit 8 to PSP Appendix, Doc. 72-3.) The transcript of the criminal trial indicates that this document was first introduced to the parties and the court in the state proceeding on the first day of trial. (Exhibit B to Plaintiff's Appendix 3-5, Doc. 86-1.)

be no reason to conclude that Richter was the driver from the information contained in the Affidavit.[18]

Thus, as to Weaver's conduct in filing the Affidavit of Probable Cause without mentioning the exculpatory evidence, there can be no question that the law was settled at the time: an arrest without probable cause violates a person's Fourth Amendment rights when an officer deliberately or recklessly omits material facts from an affidavit of probable cause, thereby causing her arrest.[19] Because a jury could conclude that no reasonable officer would have applied for a warrant as Weaver did, Weaver cannot benefit from qualified immunity for his conduct.

As to Wilson's conduct, discussed above, Plaintiff provides evidence that Wilson knowingly filed police reports containing material omissions and she suggests that his testimony at her preliminary hearing also contained known material omissions. However, the record does not reflect whether Wilson's police reports were relied upon to establish probable cause and there is insufficient evidence to show that Wilson's testimony at the preliminary hearing contained material omissions, particularly in light of the questions that he was asked. Put simply, Plaintiff has provided no evidence that Wilson's statements or omissions had any bearing on a judicial determination of probable cause. Because Plaintiff has failed to provide evidence that would be sufficient for a jury to conclude that Wilson's actions violated clearly established constitutional law (in other words, evidence that would be sufficient for a jury to conclude that

---

[18] After excising the statement "the passenger, Samuel McKnight was ejected and killed" from the Affidavit, there would be no indication that Richter was the driver. If, in addition, a statement were included that three witnesses saw McKnight driving the vehicle minutes before the accident, the Affidavit would further fail to indicate that Richter was the driver.

[19] While the Court does not rely on this to determine established law at the time, subsequent Third Circuit cases have reaffirmed this principle. E.g., Andrews v. Scuilli, 853 F.3d 690, 705 (3d Cir. 2017); Dempsey v. Bucknell Univ., 834 F.3d 457, 468-69 (3d Cir. 2016).

Wilson's actions are not immune pursuant to qualified immunity), Defendant's Motion for Summary Judgment will be granted as to the false arrest claim against Wilson on the basis of Wilson's qualified immunity.[20]

## IV. Evidence of Malice

Finally, there is no need for the Court to address the PSP Defendants' arguments concerning the existence of malice because the Court has already found that Weaver is entitled to absolute immunity for Plaintiff's malicious prosecution claim.

\* \* \*

Accordingly, for the reasons stated above, the PSP Defendants' Motion for Summary Judgment (**Doc. 69**) is **GRANTED** in part and **DENIED** in part. Specifically, the Motion is granted as to the false arrest claims against Gino Fagnilli and Robert F. Wilson and as to the malicious prosecution claim against John P. Weaver, and denied as to the remaining false arrest claim against John P. Weaver.

IT IS SO ORDERED.

June 14, 2018                                          s/Cathy Bissoon
                                                       Cathy Bissoon
                                                       United States District Judge

cc (via ECF email notification):

All Counsel of Record

---

[20] Plaintiff's brief also suggests that she intends to assert a Fourth Amendment right against Wilson based on Wilson's "continued involvement in the biased investigation." (Brief Against SJM 6.) To the extent that this right is asserted, the Court notes that Plaintiff cites no cases suggesting that this right exists. In any event, the Court finds that this right is not clearly established.